The STATE of Texas, Appellant,

v.

**HIGHLAND HOMES, LTD., Appellee.**

No. 08–10–00215–CV.

Court of Appeals of Texas,
El Paso.

June 13, 2012.

---

Joseph D. Hughes, Office of the Attorney General, Solicitor General's Office, Austin, TX, for Appellant.

Marcy Hogan Greer, Fulbright & Jaworski LLP, Austin, TX, John W. Weber, Fulbright and Jaworski, San Antonio, TX, for Appellee.

Before McCLURE, C.J., RIVERA, and ANTCLIFF, JJ.

## OPINION

ANN CRAWFORD McCLURE, Chief Justice.

After the trial court approved a class action settlement agreement between Benny & Benny Construction Co. and Highland Homes, Ltd., the State intervened complaining that the distribution of funds

violated the unclaimed property provision of the Texas Property Code. For the reasons that follow, we reverse and remand.

## FACTUAL SUMMARY

### The Underlying Lawsuit

The underlying lawsuit arose from a dispute over general liability insurance coverage between a general contractor, Highland Homes, Ltd., and its subcontractor, Benny & Benny Construction Co. In 2002, as a result of increased insurance premiums, Highland changed its policy regarding the general liability insurance requirements for subcontractors. In November 2002, Highland sent a memorandum to its subcontractors explaining that because of the higher insurance premiums it faced, it would implement a new policy effective as of January 1, 2003, by which subcontractors would be required to provide proof of general liability insurance in specified amounts. If a subcontractor did not have the specified insurance or provide proof, Highland would deduct a specified amount from the subcontractor's paycheck.

Benny & Benny interpreted the memo to mean that if a subcontractor could not provide Highland with sufficient proof of liability insurance coverage, then Highland would obtain coverage on its behalf and make a corresponding deduction from its pay check. Highland interpreted the memo to mean that a subcontractor that chose not to obtain general liability insurance coverage could still subcontract for Highland, but Highland would deduct money from its paycheck to cover Highland's additional premium expenses.

In 2006, Benny & Benny requested coverage information from Highland after one of its employees sued for personal injuries sustained on the job. Highland responded that it had not purchased insurance but had taken deductions to cover its increased exposure. This lawsuit followed deductions and the representations Highland made regarding those deductions.

### Certification of the Class

In 2008, Benny & Benny amended the suit seeking a class action, with the class comprised of those subcontractors from whom Highland made payroll deductions pursuant to the 2002 memo. On behalf of the class, Benny & Benny alleged breach of contract, fraud, negligent misrepresentation, unjust enrichment, and violations of the Texas Deceptive Trade Practices Act, Texas Insurance Code, and Texas Theft Liability Act.

On June 23, 2009, the trial court signed an order granting class certification and setting forth its trial plan. Highland appealed, but before oral argument the parties announced progress toward settlement and the appeal was abated to allow them to finalize an agreement.

### The Settlement Agreement

On January 15, 2010, the trial court signed an order preliminarily approving the settlement agreement and directing notice to potential class members. After notices issued, eight people sought to be excluded from the class. On April 29, 2010, after notice to the class, the trial court held a hearing on the settlement agreement. The parties explained that they had identified 1,864 subcontractors from whom Highland had withheld approximately $3.1 million. The settlement agreement allocated $3,672,000 to the class, resulting in each class member receiving approximately 115 percent of the amount deducted from payroll checks.

Highland hired Rust Consulting as the claims administrator to implement the settlement agreement and administer the funds. It prepared a list of subcontractors affected as well as an amount owed to

each, and created a settlement fund to pay the class members. The subcontractors currently working with Highland received distribution of settlement funds through their paychecks. Checks were mailed to former subcontractors at their last known address.

By its express terms, the settlement agreement mandated that a settlement check expired ninety days after issuance.

If the class member cannot be located and verified pursuant to the Claims Administration Process described in paragraphs 28(b) and (c), or if a settlement check is not negotiated within ninety (90) days of its issuance, the funds owed to that class member shall be considered 'unclaimed funds.' All settlement checks will expire and be of no value upon the expiration of ninety (90) days from issuance.

It also provided that any unclaimed funds would be distributed via a cy pres distribution plan to the Nature Conservancy, a non-profit, charitable organization operating in Texas. The amount of the cy pres distribution was the amount of unclaimed funds remaining after: (1) Highland was reimbursed for fees it paid to the claims administrator in excess of $30,000; and (2) Benny & Benny was paid $28,000. We have been advised that Highland has since waived any claim to the residuals. It has already paid the $28,000 to Benny & Benny and will not seek reimbursement of the administration expenses. According to the State's brief, as of October 25, 2010, the claims administrator held $465,557 in unclaimed funds.

At the settlement hearing, counsel for Highland advised the court that the Attorney General would likely oppose the settlement provisions governing the disposition of unclaimed property and wish to intervene. The court agreed to postpone ruling on the specific issue of unclaimed funds, but otherwise approved the settlement. After receiving notice of the settlement, the State intervened as expected. It filed a motion for partial new trial and a motion to modify the judgment, complaining that the agreement's unclaimed property provisions violated Texas law. The trial court denied the motions and this appeal follows.

## VALIDITY OF CY PRES AGREEMENT

The issue presented is whether the trial court erred in approving a settlement agreement which provides that the checks mailed to class members expire after ninety days, and mandates distribution of the unclaimed amounts to a charitable organization.

### *Standard of Review*

In a class action, the trial court is the guardian of the class interest and as such is charged with the responsibility of determining whether a settlement is fair, adequate, and reasonable. *General Motors Corp. v. Bloyed*, 916 S.W.2d 949, 954 (Tex.1996); *see* Tex.R.Civ.P. 42(e). The determination of whether a settlement is "fair, adequate, and reasonable" is within the sound discretion of the trial court, and the trial court's decision should not be reversed absent an abuse of that discretion. *Bloyed*, 916 S.W.2d at 955; *see also Northrup v. Southwestern Bell Telephone Co.*, 72 S.W.3d 16, 22 (Tex.App.-Corpus Christi 2002, pet. denied) ("[W]e cannot say the trial court abused its discretion in holding that the *cy pres* distribution was fair.").

To determine whether the trial court abused its discretion, we must first determine whether the challenged provisions of the settlement agreement violate Texas law. We review questions of law *de novo. See City of El Paso v. Maddox*, 276 S.W.3d 66, 70 (Tex.App.-El Paso 2008, pet.

denied) (questions of law reviewed de novo); *State v. Snell*, 950 S.W.2d 108, 112–13 (Tex.App.-El Paso 1997, no writ).

### Texas Unclaimed Property Law

■ Chapters 72 through 76 of the Texas Property Code set forth the State's unclaimed property law. *Snell*, 950 S.W.2d at 112. The Act "prescribes a mandatory procedure whereby persons or entities holding property rightfully belonging to another, but which has been deemed abandoned property (due ordinarily to some form of inactivity on the part of the rightful owner), must turn that abandoned property over to the State of Texas for safekeeping." *Snell*, 950 S.W.2d at 112. The purpose and effect of the Act is to protect absent owners, or owners who fail to timely claim their property, by placing the State in perpetual custody of the unclaimed property and providing a means for absent owners to reclaim their property. *Melton v. State*, 993 S.W.2d 95, 97 (Tex.1999); *see also Snell*, 950 S.W.2d at 113.

■ The Act applies to both tangible and intangible personal property for which "the last known address of the *apparent owner, as shown on the records of the holder,*" is located in Texas. [Emphasis added]. TEX.PROP.CODE ANN. § 72.001(a)(1)(West 2007). For most types of property, the presumption of abandonment is provided for by Section 72.101(a) which states that property is "presumed abandoned" if, for more than three years:

(1) the existence and location of the owner of the property is unknown to the holder of the property; and

(2) according to the knowledge and records of the holder of the property, a claim to the property has not been asserted or an act of ownership of the property has not been exercised.

TEX.PROP.CODE ANN. § 72.101(a)(1), (2)(West Supp.2011). Under Chapter 72 of the Act, a holder is defined as "a person, wherever organized or domiciled, who is: (1) in possession of property that belongs to another; (2) a trustee; or (3) indebted to another on an obligation."[1] TEX.PROP.CODE ANN. § 72.001(e).

However, property held by financial institutions is specifically governed by Chapter 73 of the Act. *See* TEX.PROP.CODE ANN. § 73.001– § 73.104. By its own terms, Chapter 73 supplements the other chap-

---

1. Benny & Benny argue that the State failed to show "holder" status as to the residue of the settlement case. We agree with the following analysis in *All Plaintiffs v. All Defendants*, 645 F.3d 329, 269 Ed.LawRep. 455, 79 Fed.R.Serv.3d 1149 (5th Cir.2011):

> The Appellees seemingly concede that the settlement administrator fits the statutory definition provided for the holder of unclaimed funds, but argue that, because the settlement administrator is merely carrying out the orders of the district court, we should proceed as if the district court is the holder. The Appellees then argue that a federal district court cannot be a holder under the Act, and therefore the Act does not apply.
>
> The Appellees' argument is without merit. The settlement administrator is plainly a holder, as that term is defined under the

Act, because the settlement administrator is 'in possession of property that belongs to another.' *Id.* The Appellees have, moreover, identified no exception on the face of the Act that is applicable to the settlement administrator. We will not engage in far-ranging discussion regarding the applicability of the Act to funds held directly by a district court, based merely on the speculation that the district court could, in the words of the Appellees, 'order[ ] the funds to be deposited into the registry of the court tomorrow.' Appellees' Br. at 41. The funds are in the possession of the settlement administrator, and the settlement administrator fits the Act's definition of 'holder.' The Act applies.

*All Plaintiffs*, 645 F.3d at 331–32. Similarly, we conclude that the claims administrator here is clearly the holder of the funds.

ters but also states that "each chapter shall be followed to the extent applicable." TEX.PROP.CODE ANN. § 73.001(b). Under Chapter 73, there is a specific provision applicable to the presumption for abandonment of checks and therefore is applicable here. *See id.* at § 73.102. Specifically, a check is presumed abandoned on the latest of:

(1) the third anniversary of the date the check was payable;

(2) the third anniversary of the date the issuer or payor of the check last received documented communication from the payee of the check; or

(3) the third anniversary of the date the check was issued if, according to the knowledge and records of the issuer or payor of the check, during that period, a claim to the check has not been asserted or an act of ownership by the payee has not been exercised.

*Id.* at § 73.102. A "check" under Chapter 73 "includes a draft, cashier's check, certified check, registered check, or similar instrument." *Id.* at § 73.001(a)(5). Additionally, Section 73.001 specifies that a holder "means a depository." *Id.* § 73.001(a)(4). Finally, Section 73.001(d) specifically provides that, "[a] holder of ... checks ... presumed abandoned under this chapter is subject to the procedures of Chapter 74." *Id.* at § 73.001(d).

Under Chapter 74, a holder of property which is presumed abandoned in Texas is required to report the abandoned property to, and to deliver the abandoned property to, the Texas Comptroller. TEX.PROP.CODE ANN. §§ 74.101 (property report); 74.301(a)(delivery); 74.302 (statement of delivered property). Once the property is turned over to the State, the Comptroller assumes responsibility for it and essentially steps into the shoes of the absent owner. *See Melton,* 993 S.W.2d at 102. If the abandoned property is worth $100 or more, the Comptroller must publish notice in the county where the assumed owner resides, listing the owner's name and city of last-known address. TEX.PROP.CODE ANN. § 74.201. The Comptroller is also required to compile an alphabetized list of all owners of abandoned property, annually, and make the list available to the public. *Id.* § 74.307.

■ The Act requires the Comptroller to invest unclaimed money in approved investments. She is authorized to sell unclaimed securities and use the proceeds to reinvest in other securities. TEX.PROP. CODE ANN. § 74.601(d), (e). The income from these investments (as well as the proceeds from auctioned tangible personal property items) must be deposited in the State's general revenue fund. *Id.* § 74.601(b). These regulations give the State a financial interest in the investment income generated by the funds until the principal is claimed by the owners. *See In re Lease Oil Antitrust Litigation,* 570 F.3d 244, 251 (5th Cir.2009) ("*Lease Oil I*"). Owners or their heirs may reclaim property by filing a claim with the Comptroller, and there is no time limit on filing a claim. TEX.PROP.CODE ANN. § 74.501(b); *Snell,* 950 S.W.2d at 112. However, the owner may claim only the property itself; he or she is not entitled to any interest that may have accrued in the interim. *See Clark v. Strayhorn,* 184 S.W.3d 906 (Tex.App.-Austin 2006, pet. denied).

### The Cy Pres Agreement

■ The relevant portions of the settlement agreement are located in paragraphs 28(g) and 32, and provide as follows:

[28(g) ]. If the class member cannot be located and verified pursuant to the Claims Administration Process described in paragraphs 28(b) and (c), or if a settlement check is not negotiated

within ninety (90) days of its issuance, the funds owed to that class member shall be considered 'unclaimed funds.' All settlement checks will expire and be of no value upon the expiration of ninety (90) days from issuance.

32. The parties agree to a *cy pres* distribution of unclaimed funds owed to class members that cannot be located or who fail to negotiate the settlement check within ninety (90) days of its issuance. The amount of these unclaimed funds will not be paid to individual Class Members. Such *cy pres* distribution shall be made to the Nature Conservancy, a non-profit, charitable organization operating in Texas. The amount of the *cy pres* distribution will be the sum of the undeliverable, unclaimed, unnegotiated and/or returned checks to the class members less (i) the amount of fees paid by Highland Homes to the Claims Administrator pursuant to paragraph 48 that exceeds $30,000 and (ii) the $28,000 payment to Benny & Benny described in Section E above.

Unlike in class action suits where parties are mailed some form of a claim coupon, the class members here were issued checks. Each class member was identified by name and last known address and mailed a check. Therefore, the holder of the funds had a fixed, certain obligation to each class member.

After the settlement checks were issued, the class member—as a condition of payment—had a ninety-day window within which the check must be presented. Otherwise, the check would become null and void. Effectively, the holder will be entitled to retain any amounts represented by the uncashed checks. But Texas has adopted a statute specifically providing that the expiration of a period of limitation on the owner's right to receive or recover property, whether specified by contract,

statute, or court order, does not prevent the property from being presumed abandoned or affect a duty to file a report or to pay or deliver the property to the State. TEX.PROP.CODE ANN. § 74.308.

Even if Texas had not specifically adopted this anti-limitation provision, the State argues it is still entitled to custody of the expired checks under Section 74.309 of the Act which prevents private escheat agreements. TEX.PROP.CODE ANN. § 74.309. In three heavily cited federal cases, courts have found that where similar provisions exist, the State is entitled to the expired checks because the expiration date is an unenforceable private escheat mechanism that violates public policy. *See State v. Jefferson Lake Sulphur Co.*, 36 N.J. 577, 178 A.2d 329 (1962); *Screen Actors Guild, Inc. v. Cory*, 91 Cal.App.3d 111, 154 Cal.Rptr. 77 (1979); *People ex rel. Callahan v. Marshall Field & Co.*, 83 Ill. App.3d 811, 38 Ill.Dec. 944, 404 N.E.2d 368 (1980) (*"Marshall Field"*).

In *Jefferson Lake*, the question was whether New Jersey's unclaimed property law applied to dividends issued by Jefferson Lake Sulphur Company, a New Jersey corporation. *Jefferson Lake*, 178 A.2d at 329. New Jersey's unclaimed property law generally permitted New Jersey to take custody of any dividends that remained unclaimed after five years from the date of payment. *Id.* A few months after New Jersey enacted the law, Jefferson Lake's Board of Directors voted to amend the company's certificate of incorporation to provide that any dividends that remained unclaimed for a period of three years would revert back to Jefferson Lake. *Id.* The Board of Directors mailed a notice to each of the stockholders of the company (and its predecessor) to explain the change. *Id.* In the notice, the Board acknowledged that the change was being made to circumvent the New Jersey un-

claimed property statute. *Id.* The Supreme Court of New Jersey held that "[e]scheat of unclaimed dividends serves the important public need of providing revenue to be utilized for the common good." *Id.* at 336. The court also concluded that a company that incorporates in New Jersey becomes subject to this public policy, and thus the "[a]lteration of a charter for the avowed purpose of defeating a relevant aspect of the sovereign's declared public policy cannot achieve judicial approval." *Id.* Because Jefferson Lake's charter was amended for the express purpose of avoiding the escheat laws, the court held that the amendment was invalid. *Id.* at 339.

*Screen Actors Guild* involved a situation where SAG received residuals on behalf of its members (actors, stuntmen, and other performers) and then forwarded those residuals to the member entitled to them. *Screen Actors Guild,* 154 Cal.Rptr. at 77. Under SAG's bylaws, if a residual was unclaimed for at least six years, then it reverted to SAG for the benefit of all of its members. *Id.* at 78–79. The court noted that in practice SAG did not enforce its policy and held that the bylaw was contrary to public policy because it "would deny to the state the benefit of the use of most of the unclaimed residuals." *Id.* at 80. The court also found that the bylaw provision was "obviously designed to frustrate operation of the [unclaimed property laws]," and held that the bylaws, as a mere private agreement, could not be used to circumvent a public law. *Id.* at 80.

And in *Marshall Field,* the Illinois Appellate Court was faced with the issue of whether Illinois had the right under its unclaimed property laws to take custody of unredeemed, expired gift certificates issued by Marshall Field & Co. Until 1975, Illinois' period of presumed abandonment was fifteen years, but the gift certificates issued by Marshall Field expired after ten

years. In 1975, Illinois changed its abandonment period to seven years; a year later, Marshall Field modified its gift certificates to expire after only five years. The court, relying on *Jefferson Lake* and *Screen Actors Guild,* held that "where a private agreement between the parties is in fundamental conflict with public policy as established by the legislature, the private agreement must fall." *Id.* at 373. The court also noted that, were it to reach a different result, then Marshall Field and the State might enter into an "unseemly" race as to which could come up with the shortest period. *Id.* at 374.

In addition to the anti-limitations provision, Texas law also prohibits private escheat agreements.

### § 74.309. Private Escheat Agreements Prohibited.

An individual, corporation, business association, or other organization may not act through amendment of articles of incorporation, amendment of bylaws, private agreement, or any other means to take or divert funds or personal property into income, divide funds or personal property among locatable patrons or stockholders, or divert funds or personal property by any other method for the purpose of circumventing the unclaimed property process.

■ TEX.PROP.CODE ANN. §§ 74.308; 74.309. In *State v. Snell,* 950 S.W.2d 108 (Tex.App.-El Paso 1997, no writ), this court examined the scope of Section 74.309. *Snell,* 950 S.W.2d at 112. The trial court approved a class action settlement plan that specified "settlement distribution checks or amount[s] which might be unclaimed by Appellees/plaintiff class members and which would 'otherwise escheat to the State of Texas' would instead be paid to the charity designated by the trial judge." In applying Section 74.309, we held that that the court order violated

the Act based on the provision that unclaimed class action settlement distributions would be paid to a charity designated by the trial judge rather than be escheated to the State.[2] *Id.* at 112. As part of the opinion, we stated:

> The disposition of unclaimed property in the State of Texas is not left to the whim of the private citizens or the courts, and rightfully so. The Texas Legislature has imposed a specific and detailed procedure for identifying, reporting, and tendering, and has further provided for governmental custody and distribution of unclaimed property.

*Id.* at 112.

It is true that this type of public policy exception should apply only where it is clearly established that the motive of the holder was avoidance of unclaimed property laws and in most class action settlements, this would not be the case. But here the class members were identified by name, special software was used in an attempt to locate current addresses, an address was identified for each class member, and a check was actually issued to each class member. Some of the checks were undelivered or uncashed. Here, in addition to violating the anti-limitation provision in the Act, the purpose of the challenged provisions, while possibly not the only purpose, is to avoid application of Texas unclaimed property law to the unclaimed settlement funds. As such, these provisions violate the Act. TEX.PROP.CODE ANN. § 74.309. We sustain Issue One.

### The Cy Pres Provision

In its second point of error, the State argues that the unclaimed property provisions contained in the settlement agreement cannot be justified as a cy pres provision.

■■■ The cy pres, or next best use, doctrine is an equitable doctrine adopted from the context of charitable trusts and allows the court to distribute funds which cannot be economically distributed to individual class members, or when a balance remains after individual distribution, for the next best use which is for indirect class benefit. 4 A. CONTE & H. NEWBERG, NEWBERG ON CLASS ACTIONS § 11:20 at 28, (4th ed. 2002)(hereinafter "NEWBERG"), *citing Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 107 A.L.R. Fed. 779 (9th Cir.1990) ("In a settlement context, when an aggregate class recovery cannot economically be distributed to individual class members, or when a balance of the recovery fund remains after individual distribution, the parties, subject to court approval, may agree that the undistributed funds will be distributed or disposed of for the indirect benefit of the class."). Cy pres distributions are common in the federal context where the proof of individual claims would be burdensome or the distribution of damages would be too costly. NEWBERG § 11:20 n. 1. "Experience to date indicates that fluid class and cy pres settlement distributions are important tools that should not be overlooked by the plaintiff or defense counsel in considering settlement possibilities *for a large class with small individual claims.*" [Emphasis added]. NEWBERG § 11:20 at 31.

■■■ In a recent decision, the Fifth Circuit held that a trial court's discretion to distribute unclaimed funds through the application of cy pres does not authorize the

---

2. This court also noted that, although Section 74.309 does not specifically proscribe a court from circumventing the unclaimed property process, an "individual" is specifically prevented from circumventing such process. *Id.* at 112. Thus, the court order violated Section 74.309 "by ordering an individual, the escrow agent, to transfer the funds upon the decision of the trial court of his or her appropriate charity." *Id.*

court to disregard State property laws. *All Plaintiffs v. All Defendants,* 645 F.3d 329, 269 Ed. Law Rep. 455, 79 Fed. R. Serv.3d 1149 (5th Cir.2011). We agree. Thus, to the extent that the distribution violates the Act, the trial court abused its discretion and the settlement agreement provisions are void. We sustain Issue Two.

### *What is the Remedy?*

▓ Finally, the State argues that the proper remedy is for us to reform the settlement agreement by striking the unclaimed property provisions. The general rule is that reviewing courts cannot delete or modify select provisions of a class-action settlement, because allowing piecemeal appellate review could disturb the equilibrium struck by the parties in their settlement. Here, at the request of the parties, the trial court approved the bulk of the settlement but deferred ruling on the unclaimed-property provisions until after the Attorney General was notified of the settlement, at which point the Attorney General intervened to challenge those provisions. *Id.* Accordingly, the State argues that because settlement checks were mailed and the unclaimed checks are identified by the payee's name and last-known address, we should strike the challenged provisions and order them remitted to the custody of the Comptroller.

▓ While the State's argument is persuasive, as a practical matter, the unclaimed funds technically haven't been abandoned under the Property Code because they were issued less than three years ago. We thus reverse and remand with instructions that the trial court strike Section 28(g) and Section 32 of the settlement agreement and order the claims administrator to hold the unclaimed checks for the benefit of the Comptroller until such funds are presumed abandoned.

Thereafter, in compliance with Chapter 74 of the Texas Property Code, the funds shall be remitted to the custody of the Comptroller.